IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| MAGGIE R. W., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Action No. 4:19cv130

## REPORT AND RECOMMENDATION

This matter is before the Court on *pro se* Plaintiff Maggie R.W.'s ("Plaintiff") Complaint, ECF No. 1, filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant Andrew Saul, the Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for Supplemental Security Disability Income ("SSDI") under the Social Security Act ("SSA"). Plaintiff filed a Motion for Summary Judgment, ECF No. 15, and the Commissioner filed a cross-Motion for Summary Judgment and Memorandum in Support, ECF Nos. 20, 21, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 15, be **GRANTED**, the Commissioner's

1

Motion for Summary Judgment, ECF No. 20, be **DENIED**, and the final decision of the Commissioner be **VACATED and REMANDED.**

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for SSDI on November 19, 2015, alleging an onset date of April 4, 2007. R. at 15.[1] Her application was initially denied on March 15, 2016, and again denied upon reconsideration on August 19, 2016. *Id.* Plaintiff then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on September 21, 2018. *Id.* Plaintiff appeared at the hearing with representation and testified, as did an impartial vocational expert. *Id.* On December 12, 2018, the ALJ issued a decision denying Plaintiff's application. R. at 32. On October 30, 2019, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the Commissioner's final decision. R. at 1–6.

Having exhausted her administrative remedies, on December 30, 2019, Plaintiff filed the instant Complaint for judicial review of the Commissioner's decision. ECF No. 1. The Commissioner filed an Answer on March 13, 2020. ECF No. 9. The matter was referred to the undersigned on March 16, 2020. ECF No. 11. Plaintiff filed her Motion for Summary Judgment on May 21, 2020, ECF No. 15, and the Commissioner filed a cross-Motion for Summary Judgment and a Memorandum in Support on June 22, 2020, ECF Nos. 20–21. The matter is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff was born on May 15, 1974 and was thirty-two years old at the time of her alleged disability onset date, making her a "younger individual" under the SSA's regulations. R.

---

[1] "R." refers to the certified administrative record that was filed under seal on March 13, 2020, ECF No. 10, pursuant to Local Civil Rules 5(B) and 7(C)(1).

at 31, 74. *See also* 20 C.F.R. § 416.963(c) (defining anyone under the age of fifty as a "younger person."). On September 21, 2018, Plaintiff appeared with counsel before the ALJ at an administrative hearing. R. at 15. Both the Plaintiff and an impartial vocational expert ("VE") testified at the hearing. *Id.* The record included the following factual background for the ALJ to review.

Plaintiff completed three years of college but dropped out due to heart issues. R. 1762. She testified to having past work as a customer service agent, receptionist, saleswoman, and telemarketer. R. 30. Plaintiff stated that she is currently married and has two children, a nineteen-year-old and a ten-year-old with autism who requires additional care. R. at 82–83.

Plaintiff testified that despite her alleged impairments, she volunteered as a reader in her youngest daughter's classroom, did water aerobics, and tai-chi. R. at 83, 93. As for household maintenance, Plaintiff stated that she cooked and did some dusting, while her daughter did the vacuuming and washed dishes. R. at 94. Similarly, Plaintiff explained that she was able to sustain part-time work in 2013, during which she managed to work for longer than 30-minute periods without having to rest for extended periods of time afterwards. R. at 89–90. Further, Plaintiff stated that the walking stick she occasionally used was recommended but not prescribed. R. at 95. Upon review of the results from her mental status examination, Plaintiff affirmed that she was "doing pretty good". R. at 103.

## A. Evidence Relevant to Plaintiff's Alleged Physical Impairments

Plaintiff has a history of back pain dating back to 2012 that was later identified as stable degenerative disc disease. R. at 488. After lifting a mattress in May 2012, Plaintiff complained of lower back pain that radiated into her left leg. R. at 415. At the time, while Plaintiff's gait was slow, she did not need assistive devices and exhibited full strength throughout her muscle

3

groups. R. at 415. A July 2012 x-ray found nothing except minimal degenerative changes in her spine, however a lumbar CT showed mild degenerative disc disease. R. 508. Plaintiff followed up with a pain specialist, who found that despite moderate tenderness in her spine, she exhibited normal stability, strength, and tone in her extremities. R. at 1882. Plaintiff received an epidural steroid injection for the pain. R. at 1887.

Shortly thereafter, Plaintiff went to the emergency room complaining of back pain with a fever. R. at 475. A CT scan affirmed the previously identified degenerative disc disease, but other than the pain, she did not exhibit any signs of an edema or spinal infection. R. at 478. Plaintiff also visited a rheumatologist to determine if she had rheumatoid arthritis. R. 426. After Plaintiff exhibited all eighteen of the associated tender points, the rheumatologist determined that she most likely had fibromyalgia, not rheumatoid arthritis. R. 427. Focusing on the suspected fibromyalgia, he encouraged Plaintiff to pursue physical therapy and water aerobics. R. 427.

Plaintiff began physical therapy in September 2012, however she was ultimately discharged after two appointments when she did not return and failed to schedule any further appointments. R. at 1705. Plaintiff had another appointment with the rheumatologist and a gastroenterologist after complaining of on-going diarrhea and widespread joint pain consistent with fibromyalgia. R. at 425, 443. All examinations came back negative with no cause for her current symptoms, other than suspected irritable bowel syndrome. R. at 443–44.

In February 2013, Plaintiff reported severe right facial pain and was diagnosed with trigeminal neuralgia. R. at 930. Her neurologist recommend medication, but Plaintiff refused because she did not want the medication to interfere with care for her daughter. R. at 930. Despite this new diagnosis, she exhibited full strength and range of motion in all four extremities. R. at 1768. Her condition remained relatively the same with intermittent visits for

4

her trigeminal neuralgia from February to August 2013.  R. at 1764, 1767.  In May of 2014, Plaintiff visited her orthopedist for back, face, and joint pain.  R. at 1073.  She admitted that she did not want to take medication but explained that acupuncture and exercised helped the pain.  R. at 1073–74.  Apart from a visit to the hospital complaining of headaches and a fever following a suspected tick bite in June 2014, Plaintiff's symptoms appeared to remain the same as her primary care physician did not note any new muscular pain or joint problems from July to August 2014.  R. at 1083–84, 1090, 1092.

In August 2014, Plaintiff returned to her rheumatologist complaining of a rash and pain in her hands.  R. at 1268.  The visual overview of her extremities was normal, with the exception of some soft tissue swelling in her left ankle.  R. at 1272.  She also exhibited 16 of 18 fibromyalgia tender points.  R. at 1268. Plaintiff also saw an orthopedist to examine her left foot and ankle.  The orthopedist could not find any bone abnormalities and surmised that Plaintiff either had a stress fracture or diffuse inflammatory arthropathy.  R. at 1068.  Plaintiff was not in acute pain and, out of her aversion to pain medication, indicated that she was going to pursue aquatic therapy and acupuncture.  R. at 1229.  Plaintiff's fibromyalgia was ultimately classified as moderate, and her doctors recommended treating her symptoms with warm wet heat, heating pads, massages, stretching, exercise, and aquatic therapy.  R. at 1274.

In October 2014, Plaintiff fell out of the shower, but all x-rays came back clear of fractures, alignment issues, or joint problems.  R. at 1179.  In December 2014, Plaintiff underwent a total abdominal hysterectomy and was prescribed pain medication and physical therapy to aid recovery.  R. at 1060.  By January 2015, she had stopped taking the medication and attending physical therapy.  *Id.*  Despite her reports of pain, she did not exhibit pain behavior and her gait did not show any signs of instability or balance disturbance.  R. at 1061-62.

5

In February 2015, Plaintiff followed up with her rheumatologist and orthopedist. R. at 1057, 1286. She reported that her lower back pain was stable, and she had stopped water aerobics. R. at 1287, 1058. A CT scan of her lumbar spine only showed mild lumbar degenerative changes without significant stenosis. R. at 1057. Despite the recommendations of her doctors, Plaintiff continued to refuse medication and physical therapy because of her hysterectomy recovery and the large amounts of stress surrounding the custody dispute over her youngest child. R. at 1216. However, in April 2015, she began taking medication prescribed for her fibromyalgia. R. at 1292.

In May 2015, Plaintiff reported worsening pain, stiffness, fatigue, and swelling in her joints. R. at 1151. Plaintiff's rheumatologist completed a Fibromyalgia Medical Assessment Form to assess Plaintiff's symptoms. R. at 1324–30. The rheumatologist determined that Plaintiff met the diagnostic criteria for fibromyalgia, exhibited twelve of eighteen fibromyalgia tender points, and experienced widespread pain. R. at 1324–25. The doctor did not list a specific alleged onset date but noted that these symptoms lasted for at least three months. *Id.* The listed symptoms were moderate, and they appeared to worsen with stress and anxiety. R. at 1325. Notably, the rheumatologist refrained from assessment of any functional limitations that would impact Plaintiff's ability to work. R. at 1326.

In June 2015, Plaintiff began seeing a new rheumatologist who similarly noted that she had multiple tender points, but her gait was normal. R. at 1160. Due to her pending divorce, Plaintiff stated that she was under increased stress and anxiety, which hindered her ability to go to therapy and caused her irritable bowel syndrome to flare. R. at 1160, 1551. After assessing the totality of Plaintiff's symptomology, the rheumatologist diagnosed her with Sjogren's Syndrome. R. at 1204. In keeping with past periods of effective treatment, Plaintiff resumed an

aquatic exercise program which reduced her swelling, tenderness, and increased her range of motion. R. at 1169–70.

During a visit with her neurologist, she relayed the rheumatologist's diagnosis, but laboratory tests came back negative for Sjogren's Syndrome. R. at 1492, 1500. The neurologist ran a number of other tests, all of which came back negative, except an EMG that showed chronic mild bilateral L5 radiculopathies. Plaintiff also complained of migraines and photo sensitivity. R. at 1500. In December 2015, Plaintiff revisited the rheumatologist. R. at 1536. Despite her increased stress and anxiety levels, the doctor noted that Plaintiff responded well to exercise, and aqua therapy appeared to reduce the swelling, tenderness, and aid her range of motion. *Id.*

In January 2016, Plaintiff reported that she could no longer afford acupuncture or chiropractic treatment. R. at 1054. While she managed to maintain pool therapy twice per week, she stated that it was causing her more pain. R. at 1054. The pain was now constant which also started to affect the quality of her sleep. R. at 1054. In January 2017, after the instant petition was filed while waiting for a hearing before the ALJ, Plaintiff had a CT scan of her spine that showed spondylitic changes with posterior osteophytes and disc space narrowing of three vertebrae. R. at 2155. A follow up lumbar spine x-ray showed minimal spondylosis in the mid-thoracic spine and no fractures or malalignment. R. at 2156.

Plaintiff has worn a pacemaker since 1998. R. at 841, 892, 895, 912. Plaintiff saw a cardiologist twice a year to monitor the pacemaker, and at all points during the relevant timeframe in this case the visits uniformly showed normal cardiac function, good blood pressure, and no significant cardiac issues. *Id.* Additionally, the objective medical tests, chest x-rays, CT scans, and echocardiography reports were all normal. R. at 2132.

7

In March 2018, Plaintiff underwent a consultative medical examination with Dr. Shawne Bryant. R. at 2134. Dr. Bryant opined that Plaintiff could do the following: stand for 15 minutes at a time, for one to two hours in an eight-hour workday; sit for six hours per day in 30 to 45 minute increments; lift fifteen to twenty pounds occasionally and ten pounds frequently; occasionally perform manipulative maneuvers, stoop, crouch, and squat. R. at 2137. He opined that Plaintiff should avoid work around unprotected heights, moving mechanical parts, operation of motor vehicles, limit exposure to humidity, dust, orders, fumes, vibrations, and pulmonary irritants. R. at 2146.

**B. Evidence Relevant to Plaintiff's Alleged Mental Health Impairment**

Beginning in 2012, Plaintiff sought mental health treatment with Dr. MacMillan to improve her mood, stress coping skills, and to facilitate more active and adaptive coping responses. R. at 1759. Throughout her treatment with Dr. MacMillan, Plaintiff reported she was simultaneously struggling with chronic pain, the stress of caring for her special needs child, and relational conflict with her husband. R. at 1762. She also explained that she did not want to take medication for the pain because she wanted to make sure she was able to care for the needs of her family. *Id.* Despite her stress, Plaintiff presented as alert, oriented, with normal speech, appropriate grooming, and no overt pain behaviors. *Id.* Throughout her treatment, Plaintiff continued to struggle with stress about her own medical issues and the needs of her children, as well as depression stemming from the lack of support from her husband and other difficult family relationships. R. at 1758. Plaintiff's husband refused to attend therapy with her, so Dr. MacMillan focused on pain management and how emotional factors may exacerbate her painful symptoms. R. at 1752. From January 2013 to April 2013, Plaintiff improved in her mood and coping skills despite dealing with her persisting circumstances. R. at 1742–45, 52. In May

2013, Plaintiff reported additional sources of stress at home as her marriage began to deteriorate while she simultaneously coordinated home renovations due to mold. R. at 1734. By September 2013, Dr. MacMillan noted that Plaintiff continued to improve as she was taking better care of herself physically, she had made plans to leave her husband, and both her children were doing well. R. at 1720.

There was a three-year lapse in Plaintiff's mental health treatment due to relocation, that resumed in May 2016. R. at 1711. At this point, Plaintiff was still struggling with depression because she had lost custody of her youngest daughter during the divorce from her husband, they were having difficulties co-parenting, and her oldest daughter was having behavioral issues. R. at 1709, 1711.

In 2016, Dr. MacMillan completed a Mental Functional Capacities Assessment regarding Plaintiff's impairments prior to December 2012. R. at 1623–25, 1715–17. Dr. MacMillan concluded that Plaintiff's severe pain, fatigue, neuropathy, and digestive problems had caused her to become increasingly more depressed and anxious as a result of her inability to work and function independently. R. at 1625. As such, Dr. MacMillan opined that Plaintiff was unable to work full time as she was limited in functioning due to here severe pain, fatigue, medications, and flare-ups that result in bedrest for two to three days. R. at 1623. Dr. MacMillan further opined that Plaintiff's most likely limitations would include moderate difficulty in remembering instructions, getting along with peers, awareness of normal hazards to take the necessary precautions, and responding appropriately to customary stress. R. at 1624–25. Nonetheless, Dr. MacMillan suggested that Plaintiff could have mild limitations regarding her abilities to make simple work-related decisions, interact appropriately with the general public, request assistance, and set realistic goals. R. at 1624–25.

9

## III.  THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits.  20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  The ALJ conducts a five-step sequential analysis for the Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record.  *Id.*  The ALJ must determine if:

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-00357, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity).  "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability.  Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that Plaintiff has not engaged in substantial gainful activity since April 4, 2007, the alleged onset date. R. at 18.  Second, the ALJ determined that

Plaintiff suffered from the following severe impairments: degenerative disc disease, osteoarthritis, and a heart disorder (requiring a pacemaker). *Id.* These impairments were found to be severe as they significantly limited the claimant's ability to perform basic work activities. *Id.* Plaintiff alleged other impairments, including fibromyalgia, endometriosis, a sinus syndrome, migraines, hypertension, inflammatory bowel disease, Raynaud's phenomenon, trigeminal neuralgia, skin disorders, meibomian gland dysfunction and keratitis, and Sjogren Syndrome. R. at 18–19. However, the ALJ determined that they were not severe because they "did not exist for a continuous period of at least twelve months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations." R. at 18–19.

While considering the third elemental inquiry, whether "the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments", the ALJ specifically acknowledged Plaintiff's alleged fibromyalgia diagnosis and symptomology from 2012 to the present, but "found no evidence to establish that this disorder meets the criteria of SSR 12-2p." *Id.* In 2012, Plaintiff first reported widespread pain throughout her body, that was believed to be, and generally treated as, fibromyalgia. R. at 25. Plaintiff's initial examination revealed that she possessed eighteen out of eighteen tender points typical of fibromyalgia. *Id.* The ALJ noted that throughout multiple medical examinations Plaintiff did not experience significantly reduced muscle strength or muscle atrophy, and he determined that there was no convincing evidence of a definitive diagnosis of fibromyalgia. *Id.* Dr. Thomas Blake reported that from October 2011 to February 2013, among other diagnoses, Plaintiff had fibromyalgia. R. at 30. However, the ALJ disregarded this finding and pointed out that Dr. Blake's statements were not in the form of a medical opinion. R. at 30. In 2014, Plaintiff reported that she had pain

11

in her back and left foot. R. at 27.  The treating doctor, Dr. Winfield assessed the fibromyalgia and chronic pain syndrome as deteriorated and noted that Plaintiff was not inclined to take pain medication.  *Id.*  Dr. Winfield prescribed chiropractic treatment with acupuncture and aquatic therapy, as well as a cream for Plaintiff's foot.  *Id.*  Follow up treatment records from April 2015 documented conservative treatment for various disorders, including fibromyalgia.  *Id.*  Based on these reports and corresponding treatment, the ALJ ultimately concluded that "claimant's reported fibromyalgia is not sufficiently established by persistent, objective findings consistent with that diagnosis." R. at 29.

Next, the ALJ determined that the evidence failed to show that Plaintiff has "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpart P, App. 1." R. at 21.  The ALJ assessed Plaintiff's "severe" impairments, including her degenerative disc disease and osteoarthritis under Listings 1.02A and 1.02B; and her heart disorder under Listing 4.20.  *Id.*  The ALJ found that "these impairments are not attended by symptoms that fulfill the requirements of any listed impairment and no medically acceptable source has concluded that the impairments medically equal any impairment listed 20 CFR part 404, Subpart P, Appendix 1." *Id.*

The ALJ also performed additional analysis with respect to Plaintiff's medically determinable mental impairment, depression, under sections 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders), using the "paragraph B" criteria to determine the severity of Plaintiff's mental impairments.  R. at 19.  To satisfy the paragraph B criteria, a mental impairment must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.  20 C.F.R. Pt. 404, Subpt P, App. 1.  The ALJ found that "depression does not cause

12

more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." R. at 19, 20. Parenthetically, the ALJ acknowledged the 2018 report of Dr. MacMillan, Plaintiff's treating mental health clinician. R. at 20. Despite the report's explanation of Plaintiff's symptoms and the effects of her medication, the ALJ gave it little weight due to conflicting testimony from the Plaintiff regarding her medication and relationship status that previously contributed to depression, stress, and anxiety. R. at 20.

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by the SSA regulations, except Plaintiff could only occasionally climb stairs, stoop, kneel, and crouch, but never climb ladders or crawl. R. at 21. She could have no more than frequent exposure to dust, fumes, pulmonary irritants, vibrations, sustained loud noises, unprotected heights, or dangerous machinery. *Id.* Further, Plaintiff capabilities included frequent, but not always, fine manipulation with either hands, twisting of the cervical spine or head, and limited standing or walking for up to four hours total within an eight-hour workday. *Id.* Plaintiff was limited to maintaining persistent effort on only simple tasks to reduce stress and minimize changes in tasks or work settings. *Id.*

Finally, the ALJ determined that, through the date last insured, Plaintiff was incapable of performing her past relevant work as a telemarketer/customer service representative as this work required the performance of work-related activates precluded by Plaintiff's RFC. R. at 30. Nevertheless, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. R. at 31. Therefore, after considering the physical and mental demands of her past work, Plaintiff's RFC, and the available jobs that she was capable of performing, the ALJ found that Plaintiff was not disabled under the section 1614(a)(3)(A) of the SSA. *Id.*

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff presents two claims of error: (1) "The ALJ erred in finding Plaintiff's fibromyalgia did not meet the criteria of SSR 12-2p" and (2) "The ALJ's RFC determination is unsupported by his failure to properly weigh Plaintiff's treating psychologist, and failure to provide any reasons for discounting the disabling limitations opined by the [Consultative Experts]."

**A. The ALJ erred in finding Plaintiff's fibromyalgia did not meet the criteria of SSR 12-2p**

Plaintiff argues that the ALJ's analysis was inconsistent with both SSR-12-2p and the record evidence, including the treatment notes of Plaintiff's treating and examining physicians. ECF No. 16 at 10.  SSR 12-2p outlines two sets of criteria by which an ALJ may determine, upon review of licensed physicians' diagnosis and treatment notes, that a plaintiff has a medically determinable impairment of fibromyalgia.  First, the 1990 ACR Criteria for the Classification of Fibromyalgia requires,

> (1.) A history of widespread pain . . . that has persisted (or that persisted) for at least 3 months.  The pain may fluctuate in intensity and may not always be present.  (2.) At least 11 positive tender points on physical examination . . . . (3.) Evidence that other disorders that could cause the symptoms or signs were excluded.

SSR 12-2p.  Similarly, the 2010 ACR Preliminary Diagnostic Criteria requires,

> (1.) a history of widespread pain; (2.) repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3.) Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Id.*  The ALJ found that there was "no evidence" to establish that Plaintiff's fibromyalgia met this criterion.  R. at 18.  However, this finding appears to stem from an improper analysis contrary to Fourth Circuit jurisprudence regarding the evaluation of fibromyalgia as a medically determinable impairment.

The ALJ erred by improperly evaluating fibromyalgia as a disorder per Fourth Circuit decision in *Arakas v. Commissioner*, 983 F.3d 83 (4th Cir. 2020).  In *Arakas*, the Fourth Circuit reversed a similar finding under similar circumstances because the ALJ "failed to understand and consider the unique nature of fibromyalgia."  *Arakas*, 983 F.3d at 95.  Arakas was fifty years old when she first applied for disability insurance benefits.  She previously worked as a dining room

15

manager but stopped working fulltime in 2010 due to her alleged disability. *Id.* at 90–91. Among her many medical conditions that presented possible limitations, including degenerative disc disease and carpal tunnel syndrome, the most significant was fibromyalgia. *Id.* at 91. Arakas's treating rheumatologist diagnosed her with fibromyalgia based on his findings of "'exquisitely tender trigger points' throughout her neck and shoulder muscles, hips, knees, and upper, mid, and lower back. *Id.* The rheumatologist noted that she generally maintained the full range of motion of her joints, but physical exertion and lack of sleep aggravated her symptoms. *Id.* The prescribed treatment included, physical therapy, various medications specifically for fibromyalgia, antidepressants that help control neuropathic pain, and narcotic painkillers. *Id.*

Arakas initially filed for disability in 2010, alleging disability based on various conditions including fibromyalgia. *Id.* at 90. Her claim was denied by the ALJ and Appeals Council, but the District Court reversed and remanded the case instructing the Commissioner to "make findings of fact regarding an opinion letter submitted to the Appeals Counsel by Dr. Frank Harper, Arakas's long-time treating physician, in support of her application." *Id.* at 89. On remand, the ALJ denied her claim a second time, and Arakas again sought relief from the District Court. A Magistrate Judge recommended, and the District Court later adopted the affirmance of the Commissioner's second denial. *Id.* Arakas timely appealed to the Fourth Circuit. *Id.* at 90.

During the course of Arakas's proceedings, Dr. Harper provided three opinion letters explaining the nature and extent of the diagnosis and treatment for her fibromyalgia. *Id.* at 92. He specifically emphasized that fibromyalgia typically did not produce laboratory abnormalities, disagreeing with the ALJ's reliance on the lack thereof. *Id.* In each of Dr. Harper's letters he described the chronic pain and fatigue caused by Arakas's fibromyalgia and stressed her inability to "sustain work even at a light exertional level full time." *Id.* In contrast, the state agency

16

consultants who assessed Arakas's physical and mental limitations concluded that she had the requisite findings for fibromyalgia but could still perform certain functions with little or no limitation. *Id.* Similarly, the state agency psychologists deemed Arakas's mental impairments non-severe, but they noted that the pain and fatigue caused by her fibromyalgia could be causing her depression and problems with attention and concentration. *Id.*

In reviewing the ALJ's application of the typical two-step process, the Fourth Circuit took specific issue with how the ALJ comparatively weighed the subjective and objective medical evidence of Arakas's alleged disability.

> The Fourth Circuit "has battled the [Commissioner] for many years over how to evaluate a disability claimant's subjective complaints of pain." In fact, the two-step process that SSA uses to evaluate symptoms was born out of a long history of disagreements between this Court and the agency over this very issue. Since the 1980s, we have consistently held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." Rather, a claimant is "entitled to rely exclusively on subjective evidence to prove the second part of the test."

*Id.* at 95 (citations omitted). The Fourth Circuit held that the ALJ disregarded this precedent by improperly discounting subjective complaints of pain and fatigue, and improperly elevating the need for objective medical evidence substantiating Arakas's statements. *Id.* at 95–96.

This type of legal error is increasingly significant in cases involving fibromyalgia, where the symptomology is entirely subjective, with the exception of objective tender points assessment. When diagnosing and assessing the severity of fibromyalgia, "physical examinations will usually yield normal results—a full rang of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnart*, 335 F.3d 99, 108–09 (2d Cir. 2003). Thus, findings that effectively require objective evidence for a disease characterized by subjective symptoms are erroneous. The Fourth Circuit

17

also noted that this error was particularly egregious in Arakas's case as Dr. Harper's opinion letters explicitly emphasized the unique nature of fibromyalgia and the absence of objective abnormalities. *Id.* at 96.

The most recognized and only objective medical evidence of fibromyalgia are trigger-point findings, i.e. tenderness in specific sites on the body.[2] In *Arakas*, the ALJ repeatedly referenced the supposed lack of objective medical evidence supporting the Plaintiff's complaints, while simultaneously disregarding the objective evidence proffered regarding her tender point findings. *Id.* at 96, 97. The ALJ claimed that the findings were based on a multitude of factors, not just the objective medical evidence or lack thereof. *Id.* However, the Fourth Circuit's holistic review revealed an erroneous reliance on, and effective requirement of, objective evidence that was indicative of a larger misunderstanding of the uniqueness of fibromyalgia. *Id.*

> The Fourth Circuit further summated,
>
> Today, we join those circuits by holding that ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence. Objective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease. If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence substantiating the claimant's impairment. We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.

*Id.* at 97–98. Ultimately, the court held that the ALJ's evaluation was erroneous as it was based on "incorrect legal standard as well as a critical misunderstanding of fibromyalgia." *Id.* at 98.

---

[2] Throughout the relevant sources of authority, "trigger points" and "tender points" are used interchangeably to describe the objective assessment of extreme tenderness in specific sites on the claimant's body. In accordance with the terminology used in SSR 12-2p, the undersigned will proceed using the term "tender points".

The ALJ in this case has similarly erred in his assessment of Plaintiff's fibromyalgia. Here, the ALJ found that there was "no evidence" to establish that Plaintiff's fibromyalgia met the criteria of SSR 12-2p. R. at 18. However, the ALJ's analysis is inconsistent with both SSR 12-2p and the rationale explained in *Arakas*. In fact, it appears that Plaintiff met both the 1990 and 2010 ACR criteria for the classification of fibromyalgia. As for the 1990 criteria, Plaintiff has a well-documented history of widespread pain stemming from the onset date, April 4, 2007. This includes the 2015 Fibromyalgia Medical Assessment Form that indicated Plaintiff's symptoms, including widespread pain, had persisted for at least three months. R. at 1324–30. Further, every physical examination assessing tender points during the relevant time period revealed Plaintiff possessed more than the eleven required positive tender points, the first of which in 2012 showed that Plaintiff tested positive for eighteen of eighteen tender points. R. at 25, 1268, 1324. There is also evidence that other disorders that could cause these symptoms have been ruled out. This was addressed in Plaintiff's 2015 follow up with her neurologist, during which a number of laboratory tests came back negative, including a test for Sjogren's Syndrome, the rheumatologist's primary alternative diagnosis at the time. R. at 1492, 1500. Similarly, under the one differing factor outlined in the 2010 ACR criteria, there is evidence throughout the record that Plaintiff manifested six or more fibromyalgia symptoms during the relevant time period including: widespread pain, fatigue, memory problems, depression, anxiety, and diarrhea suspected to be irritable bowel syndrome. R. at 18, 20, 425, 443,1324, 1325, 1160, 1551.

The ALJ's finding that there is "no evidence to establish that this disorder meets the criteria of SSR 12-2p" and that "the rheumatology examination did not reveal objective findings consistent with the diagnosis of fibromyalgia" are indicative of a misunderstanding of the unique

nature of fibromyalgia. This misunderstanding appears to have infected the entire opinion including the evaluation of the aforementioned criteria as well as the consideration of the treating and consultative physicians' opinions.

Moreover, the ALJ improperly discounted Plaintiff's subjective complaints, with little to no mention of her objective tender points consistent with fibromyalgia. In doing so, he effectively relied on the absence of objective findings during the 2015 examination like abnormal gait and station, obvious swelling, synovitis, and dactylitis of the wrists, knees, elbows, or hands. R. at 18. However, the absence of these objective indicators does not nullify the existence of fibromyalgia. In fact, reliance on the absence of objective indicators is both contrary to law and misleading when attempting to assess the presence, severity, and limiting effects of fibromyalgia because the condition is characterized by waxing and waning subjective symptoms.

Moreover, the ALJ incorrectly relied on conservative treatment to minimize the seriousness of symptoms, when no other treatment was available, all the while, cherry-picking facts from medical records where Plaintiff was improving or not explicitly complaining of symptoms. R. at 19, 23. The cherry-picking of facts is notably concerning as fibromyalgia symptoms, by definition, wax and wane over time. Even with the conservative treatment, the record is replete with evidence of fibromyalgia and its limiting effects on Plaintiff's life. Whatever functionality Plaintiff was able to maintain appears to have been done out of necessity, like taking care of her child and maintaining her home. In fact, the correlation between stress and anxiety in her life and increased symptomology appears to be evidence of the limiting nature of Plaintiff's fibromyalgia. Multiple physicians throughout the record note Plaintiff's persistent

desire and effort to care for her children.  However, they also note that the stress and anxiety of those efforts often led to periods of increased fibromyalgia-related symptoms.

Put simply, the ALJ's remarks that "no evidence" existed to establish Plaintiff's fibromyalgia met the criteria of SSR 12-2p are patently incorrect and represent either a misunderstanding or disregard of the disorder as described by the *Arakas* court.  As such, the ALJ erred in finding Plaintiff's fibromyalgia did not meet the criteria set out in SSR 12-2p despite substantial evidence to the contrary.

**B. The ALJ failed to properly weigh the opinion of Plaintiff's consultative examiner in determining Plaintiff's RFC.**

Plaintiff also argues that the ALJ's RFC determination is unsupported because of his failure to properly weigh the findings of Plaintiff's treating psychologist, Dr. MacMillan, and consultative examiner, Dr. Bryant.  The parties agree that the ultimate RFC determination is left to the ALJ, however they disagree as to what weight should be given to the opinions of treating and consultative physicians.  Returning to *Arakas,* the Fourth Circuit reiterated the well-established "treating physician rule"[3] that requires "ALJs give 'controlling weight' to a treating physician's opinion on the nature and severity of the claimant's impairment if that opinion is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with the other substantial evidence' in the record" *Arakas*, 983 F.3d at 106 (quoting 20 C.F.R. § 404.1527(c)(2)).  Where ALJs decide not to give controlling weight to these opinions, "ALJs must determine the appropriate weight to be accorded to the opinion by considering 'all of . . . the factors' listed in the regulation, which include the length of the

---

[3] On January 18, 2017, the SSA adopted new rules modifying the rule of primacy for treating physicians' opinions for claims filed after March 27, 2017.  20 C.F.R. §§ 1520(e); 1527.  The new rules do not apply here since Plaintiff's claim was filed in 2015.

treatment relationship, consistency of the opinion with the record, and the physician's specialization." *Id.*

Here, the ALJ afforded Dr. MacMillan's report little weight, characterizing it as "extreme". R. at 20; ECF No. 21 at 28.  In keeping with the above standard, the ALJ explained that Dr. MacMillan's report was inconsistent with Plaintiff's own statements regarding her functional limitations. R. at 20.  The ALJ specifically noted that Dr. MacMillan reported that Plaintiff "was unable to sustain goal-directed activities for much over an hour period" as her symptoms caused "functional deficits in cognitive functioning, including information processing speed and efficiency, persistence, complex and divided attention, and memory." R. at 20.  In contrast, the ALJ pointed out that Plaintiff's part-time employment and testimony regarding her physical capabilities undermined Dr. MacMillan's opinion. R. at 29.  Similarly, the ALJ found that Plaintiff's stress and anxiety stemming from her abusive marriage and tumultuous domestic life were minimized as she was no longer in that marriage and abusive situation.  R. at 20. Further, without refuting Plaintiff's apparent mental health diagnoses, the ALJ also acknowledged that Plaintiff scored a 29 out of 30 on the Mini Mental Status Examination ("MMSE"), a score indicating no evidence of cognitive impairment. R. at 29.  Accordingly, the ALJ's analysis appears to comport with the standard set out for ALJ's to deviate from the "treating physician rule".  As such, the ALJ's decision to afford MacMillan's opinion little weight is supported by more than a mere scintilla of evidence as is required by the substantial evidence standard.

As to Dr. Bryant, the ALJ rejected some of his findings and afforded his opinion little weight.  R. at 30.  Even if substantial evidence supported the ALJ's minimization of Dr. MacMillan's opinion based on Plaintiff's contradiction of the asserted limitations, the ALJ's

diminishment of Bryant's opinion was not supported by substantial evidence because of his aforementioned misunderstanding of fibromyalgia. *See* R. at 30. In fact, the ALJ provided further confirmation of his misunderstanding and improper emphasis of the lack of objective findings over Plaintiff's subjective symptomology, by noting that the recommended limitations from Dr. Bryant were consistent with Plaintiff's chronic pain but inconsistent with the objective normal findings. As previously stated, sole reliance on objective findings, which are very limited for this disorder, is contrary to both *Arakas* and further evidences the alleged cherry-picking of facts.

Therefore, the Court **FINDS** that substantial evidence does not support the ALJ's finding regarding the proper weight to be given to the opinion of the consultative physician, Dr. Bryant.

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 15, be **GRANTED**, the Commissioner's Motion for Summary Judgment, ECF No. 20, be **DENIED**, and the final decision of the Commissioner be **VACATED and REMANDED.**

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within

fourteen days after being served with a copy thereof.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2.  A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made.  The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to mail a copy of this Report and Recommendation to *pro se* Plaintiff and forward a copy of the same to counsel for the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Newport News, Virginia
January 20, 2021

24